## TABOR v. SULLIVAN ET AL.

1. UNCOMPLETED CONTRACT BY TENANTS IN COMMON TO CONVEY A DEFINITE PARCEL OF LAND — LEGAL EFFECT OF A VERDICT OF A JURY ON EQUITABLE ISSUES IN EJECTMENT.— The eight locators of a mining claim, all owning undivided interests, agreed to convey a parcel thereof by metes and bounds to the owners of an adjoining location. Five of the grantors executed a deed, which had been prepared and left with a notary public, when a dispute arose about an alleged attempt of the grantees to stake off more ground than was embraced in the agreement. The remaining three owners declined to execute the deed, and nothing further was done under the contract, nor was the partially-executed deed delivered, but the same was allowed to remain uncalled for in the possession of the notary. About a year afterwards, being six months after the decease of the notary, the deed was searched for and found among the papers of the deceased notary by an attorney of one of the then owners of the adjoining location, and by his advice filed for record. Prior to its discovery the owners of the first-mentioned location, including those who had executed the unfinished deed, conveyed the entire lode as located to one F., who, a few days after said deed had been filed for record, conveyed the entire lode to the appellant, who went into possession, applied for and obtained a patent in his own name without opposition, and has ever since his entry conducted extensive mining operations upon the property. About a year after issue of the patent the appellees, claiming under the partially-executed deed, entered upon the parcel therein described, asserting title to seven-tenths thereof, when appellant brought the present action to eject them. Appellees set up in defense their equitable title by a cross-complaint. F., appellant's immediate grantor, appeared and testified for the appellees, his testimony being that one of his grantors told him at the time of his purchase that a part of the ground (pointing it out) had been deeded away; that he had made an effort to find out who had signed the deed, and where it was, but could find no trace of it, and having ascertained that the title of record to the whole lode was in the names of the locators, he completed his purchase from them. No other tangible facts were shown to have been communicated to him concerning the matter; and, on cross-examination, he admitted that he was interested with the defendants (appellees) in the event of the suit, and that he had given the plaintiff no intimation of the former conveyance when selling to him. Further testimony showed that said deed was filed for record a few days prior to appellant's purchase, although he had no actual knowledge of it, and never heard of the transaction until after his purchase.

The whole case was submitted to the jury and a verdict returned for the appellees, and judgment rendered thereon. *Held*, that under the present practice, permitting a purely equitable defense to be set up to an action of ejectment, if such a cause be submitted to a jury, and a verdict, based on facts pertaining to the equitable issues involved, be returned for the defendant, such verdict is not absolutely binding on the court, but advisory only; and the chancellor may exercise great latitude in the consideration of the evidence received in support of such equitable issues.

2. INTERESTED WITNESS ATTEMPTING TO DEFEAT HIS DEED TO GRANTEE — HOW REGARDED.— The conduct of plaintiff's immediate grantor, whose testimony was mainly relied on to defeat the plaintiff's title, and who was interested with the defendants in the event of the suit, in attempting by his testimony to destroy the title he had conveyed to the plaintiff, justly subjects his testimony to suspicion, and greatly lessens its value as evidence for the defendants.

3. UNRECORDED DEED — A PURCHASER, HAVING, WITHOUT AVAIL, MADE DUE INQUIRIES CONCERNING, PROTECTED IN PURCHASING RECORDED TITLE.— Conceding that the witness had sufficient information about the partially-executed deed at the time of his purchase to put him upon inquiry, having testified that he "made an effort to find out who signed the deed and where it was, but found no trace of it," the court will assume, under the circumstances, that he made the requisite investigation before completing his purchase. This inference is supported by the record as to the facts which an exhaustive investigation must have disclosed, viz., an agreement by all the owners of the parcel in controversy, and not a several agreement by each owner, to convey the entire parcel, and not undivided interests thereto; that the contract was never completed, nor the partially-executed deed ever delivered, nor its delivery ever requested by the grantees named therein; and that it is doubtful if there was a legal consideration to support the contract to convey. Such information would, in law, have justified the purchaser in assuming that the contract to convey had been abandoned, and he would have been warranted in purchasing from the owners of the recorded title.

4. THE TITLE OF LAND HAVING VESTED IN AN INNOCENT PURCHASER CANNOT BE SUBSEQUENTLY DIVESTED AS TO HIM OR HIS GRANTEES. F., being an innocent purchaser, and the legal title to the whole premises having vested in him, it could not be divested, as to the parcel in controversy, by the subsequent discovery and recording of an earlier conveyance thereof, and his grantee would be equally protected, although the earlier deed was on file at the time of the latter's purchase.

*Appeal from the District Court of Lake County.*

THE appellant, Horace A. W. Tabor, brought suit in the district court of Lake county in July, 1881 against Dennis Sullivan, Peter Finnerty and Charles L. Hall, for the recovery of a small parcel of ground constituting the south end of the Matchless lode, situated in said county. The complaint was in form ejectment, alleging title in fee-simple and possession in the plaintiff to the whole lode as located and patented, and an illegal entry upon the parcel in controversy, and ouster of the plaintiff therefrom by the defendants. To the complaint was added a prayer for equitable relief, based on allegations that defendants were mining and carrying away valuable minerals, which acts the court was asked to restrain by a temporary injunction.

The defendants answered the complaint, denying the alleged illegal entry and ouster, and filed a cross-complaint in which they admitted that plaintiff held the legal title to the entire lode by patent from the United States, setting up, however, an equitable title in themselves to seven-tenths of the parcel in controversy, as tenants in common with the plaintiff, and praying that plaintiff be decreed to convey said interest to the defendants.

The record in this case discloses that the Matchless lode claim was located on June 18, 1878, by the following-named persons, and that they severally claimed the undivided interests in the location attached to their respective names, to wit: Henry Smith one-sixth, Peter Starr one-sixth, John Brashear one-sixth, John Anderson one-tenth, Peter Owens one-tenth, John Garney one-tenth, William Malay one-tenth, and Peter Hughes one-tenth. A relocation certificate was filed July 8, 1878, by and in the names of the same parties, which claimed for them respectively the same undivided interests in the property as the original.

The foundation of appellees' claim to the parcel of the

lode in controversy was an agreement by the locators of
the Matchless with the locators of the Dolphin lode claim
(which latter claim adjoined the Matchless at its southern
extremity) to convey to the Dolphin parties the south
fifty feet of the Matchless location.  It was not a several
agreement with the respective locators of the Matchless,
wherein each one contracted to convey his undivided in-
terest in the parcel to the Dolphin parties, but an entire
contract whereby the owners of the Matchless location
agreed to convey the parcel by metes and bounds to the
owners of the Dolphin.  A deed, bearing date August 21,
1878, was prepared and left with a notary public in Lead-
ville to be executed by the Matchless owners, but it did
not appear to correspond with the agreement, either as
to the quantity of ground to be conveyed or as to the
names of the grantees.   Charles Davers and Jacob Han-
seth were the locators of the Dolphin, but the deed as
drawn named Nelson Hallock, Galatia Sprague and Peter
Finnerty as the grantees, who, it appears, were negotiat-
ing to purchase the Dolphin.   Five of the Matchless lo-
cators, however, had called at the office of the notary
and executed it before any dispute concerning the mat-
ter arose, when some one reported that the stakes of the
parcel were being placed so as to take more than fifty
feet of ground.   Thereupon the remaining three refused
to sign the deed, and the agreement to convey was never
completed.   The names of those who had executed the
deed were Brashear, Smith, Starr, Malay and Hughes,
the aggregate of whose interests in the Matchless lode
and in the parcel mentioned was the undivided seven-
tenths.

In this unfinished condition the deed was allowed to
remain in the possession of the notary.   About six
months thereafter he died.   Other parties became inter-
ested in the Dolphin, among them Lewis Tappan, who,
about one year after the making of the agreement men-
tioned, employed an attorney to examine the title of the

Dolphin. He reported a slight conflict between the two locations, and in seeking for evidence to reconcile it learned of the existence of this deed, but no one knew what had become of it. He succeeded in finding it among the papers of the deceased notary, in an old safe owned and used by him in his life-time, and delivered it to Tappan, who by the attorney's advice placed it on record, the date of its record being August 24, 1879, or one year and three days after its date. Prior to its being filed for record, Brashear, one of the persons who had executed it, conveyed his one-sixth interest in the entire Matchless lode as located to two persons by separate deeds, one-twelfth to each. The grantees were Peter Hughes, one of the original locators of the Matchless lode, and the other was one Edward Fitzgerald.

These deeds bear date March 8, 1879. Subsequently the remaining locators of the Matchless, together with Fitzgerald, conveyed the entire lode to one Tim Foley, their several deeds being recorded prior to the filing of the partially-executed deed above mentioned. On August 30, 1879, a few days after said deed was filed for record, Foley conveyed the entire lode claim to the appellant, Tabor. The appellant filed his deed for record on the same day, went into possession of the whole property, and commenced mining operations thereon. On January 19, 1880, he applied for a patent, and, no adverse claim being filed, he received a patent for the entire lode on June 30th following.

Afterwards, in May, 1881, Hallock and Sprague, two of the grantees of the parcel in controversy, conveyed all their interest therein to the appellee, Dennis Sullivan, and soon after Sullivan and Finnerty entered upon the parcel, claiming to own the undivided seven-tenths thereof, and commenced to work and mine the same, whereupon the appellant instituted the present action to eject them.

The material facts of this case will be found in the

opinion of the court and in the concurring opinion of Mr. Justice ELLIOTT, but for convenience of reference the history of the case down to the commencement of suit has been arranged in the order of the occurrence of the principal facts.

Messrs. L. C. ROCKWELL and J. D. WARD, for appellant.

Messrs. C. REED, J. B. BELFORD, P. WYKOFF and PATTERSON & THOMAS, for appellees.

BY THE COURT. The first inquiry we deem it important to make relates to Foley's knowledge of the unrecorded deed at the time of his purchase; but, in examining the evidence upon this subject, we must bear in mind two propositions, viz.: *First.* That though the action in its inception was ejectment, yet the pleadings admit the legal title to be in plaintiff. Defendants, by their cross-complaint, present a defense purely equitable in its nature, and the evidence in question was admissible only in connection with this equitable defense. Therefore, while the entire case was, against plaintiff's objection, submitted to the jury, and while the form of the verdict is that usually adopted in ejectment, yet in truth it is based upon findings of fact pertaining exclusively to equitable issues. Such findings are, under the present practice, not absolutely binding upon the court. They were in the case at bar merely advisory to the chancellor below, and this court is free to exercise great latitude in considering evidence received in support of the equitable issues involved, even though it may have been submitted to the jury. *Second.* That Foley, whose testimony is mainly relied on to establish his knowledge of the unrecorded deed, is clearly shown by his own admission and other evidence to be interested on the side of defendants in the event of the suit. He was put upon the stand by them for the express purpose of attacking the title which he

himself had previously conveyed to plaintiff. The latter's title to seven-tenths of the fifty feet in controversy is sought to be undermined and destroyed by showing that Foley had notice of the existence of the unrecorded deed, and therefore did not himself take an indefeasible title under the statute. Foley's position in the case, interested as he is with defendants, who are seeking to destroy the title of his grantee, conveyed, as he himself acknowledges, without a word of notice or warning to such grantee, justly subjects his testimony to the suspicion of bias, warrants the most searching scrutiny, and greatly lessens its value as evidence for the defendants.

But what does Foley say as to his knowledge of the unrecorded deed at the time he purchased? We quote a portion of his testimony: "Well, about the only thing that was said was that a piece of this ground had been deeded away,— pointed out the ground. Hughes was the man that did it.  *  *  *  I don't think I understood as to whether it was stated that all or only a part [of the locators] had signed the deed. At that time I don't think there was anything said about it. I received a deed for the whole of the Matchless from the same parties after I had been told some portion of it had been deeded away.  *  *  *  I took the deed for the entire ground, finding it all in their names. I never learned where this deed was. As to who signed it I have no knowledge at the present time. Whether that was mentioned or not I could not say.  *  *  *  I have no recollection of Mr. Hughes saying anything about the deed being good or bad. I could not swear as to the circumstances under which it was made, either.  *  *  *  I made an effort to find out who signed the deed, and where it was, but I did not find any trace of it."

Besides Foley's testimony the record contains the following (given by Starr, one of the Matchless locators, and also an interested witness, called by defendants): "*Question.* Well, give the substance of what you told

him [Foley] as to whether you had given any of it away or not. *Answer*. I don't recollect. I could not say; but I know I told him something with regard to that portion of the ground. I may have told him about having deeded it. I don't remember. I told him something about that portion we agreed to let Davers have. I didn't tell him about the circumstances under which we conveyed it."

It thus appears that Foley's information as to the existence of a prior valid conveyance covering fifty feet of the Matchless lode, and as to the character of such conveyance, if made, was extremely slender and unsatisfactory. But, conceding that it was sufficient to put him upon inquiry, we must assume, for the purposes of the present controversy, that he made the requisite investigation. He says: "I made an effort to find out who signed the deed, and where it was, but I did not find any trace of it." The duty of showing the character of this "effort," and its sufficiency, if a doubt thereof existed, did not, in our judgment, devolve upon plaintiff. Under the circumstances, he might safely accept Foley's declaration in this regard. Moreover, were Foley the plaintiff, and undertaking to defend his own title, we are not prepared to say that this evidence would have been insufficient, especially coupled, as it should be, with matters we shall presently mention. But, considering the nature of the proceeding and attitude of the parties, it is clear that we should hold defendants' endeavor to destroy plaintiff's title by showing a want of good faith in Foley's purchase a failure.

The foregoing conclusion is rendered impregnable by a reference to the disclosures that must have followed the most exhaustive investigation by Foley. He would have learned that the agreement was an arrangement with all of the Matchless owners for the entire title to the strip of ground, not a several or individual agreement with them for their undivided interests therein;

that three of the parties who were to have been grantors had positively refused to execute the deed, and that all effort to procure their signatures had been abandoned; that the grantees named in the instrument, had he succeeded in discovering who they were, never obtained or even requested its possession; that it had been lying for nearly a year in the safe of a notary public, who in the meantime had deceased, and that its whereabouts were forgotten by all the parties, except possibly Hallock. He would also have found strong evidence tending to show that there was no legal consideration for the instrument, and that there had been no legal delivery thereof by the five grantors who had signed it. With such information Foley would have been justified in law in assuming that the agreement in pursuance of which the conveyance was attempted had been wholly canceled or abandoned by the parties.

But if Foley's title was good, plaintiff's title cannot be successfully challenged. It was immaterial to plaintiff that the deed under which defendants claim title had been recorded prior to his purchase. Foley being protected under the recording act at the time of his purchase, his title is not vitiated by the subsequent filing of the earlier conveyance, and his grantee is as fully protected as himself. *Page v. Waring,* 76 N. Y. 463, and cases cited; Wade, Notice, § 241.

It follows from the foregoing conclusions that plaintiff and defendants are not, and never have been, cotenants as to the ground in controversy. For this reason it is unnecessary to discuss or determine the question whether joint tenants or tenants in common should adverse the proceedings for patent instituted by one cotenant in his own name alone.

The deed on which defendants rely is further challenged upon the theory that it is wholly lacking in the two essential elements of consideration and delivery. In view of certain facts bearing upon these subjects that

were established by uncontroverted testimony, and certain other facts shown by a strong preponderance of evidence, it may be that this challenge is well taken, especially in so far as it relates to the subject of delivery; but, having decided the case on another ground, we shall not prolong the opinion by passing upon the questions thus raised.

*Judgment reversed.*

ELLIOTT, J. (*concurring*).   This was an action for the recovery of certain mining property, and for a temporary writ of injunction to restrain defendants from working and extracting ores from the mine pending the litigation.

· The defendants, by their answer, after sundry denials, admit the legal title of the property to be in the plaintiff by patent from the United States, but claim that they are the owners in equity of an undivided seven-tenths interest in a portion of said property, setting forth the facts upon which their equitable title is founded, and asking that plaintiff be declared a trustee for them under said patent of said seven-tenths interest, and that he be decreed to convey the same to them by good and sufficient deed.   Replication was duly filed.

The action was brought in July, 1881, and in September, 1883, was voluntarily dismissed by plaintiff without notice to defendants.   In December of the same year the dismissal was set aside, and the action reinstated upon the application of the defendants after due notice to the plaintiff.   It is assigned for error that the defendants were allowed to reinstate this action after the plaintiff had thus dismissed it.   Inasmuch as the answer contained a counter-claim asking affirmative relief, plaintiff could not thus dismiss his case (Code 1883, § 147); and if he did so, the application of defendants was in time to entitle them to relief from such judgment by reinstating the case (Code, § 78).

That this answer contained a counter-claim, see Code, § 72. It was an equitable counter-claim, and might have been prosecuted by defendants even if plaintiff had brought no action. Affirmative relief was prayed, to which defendants would have been entitled if their theory of the case should be established. Bliss, Code Pl. §§ 348–351, also §§ 367, 368; Pom. Rem. § 734 *et seq.*

Louis Verdin was called as a juror, and testified upon his *voir dire* that he was acquainted with all the parties to the action, that he knew the location of the property in controversy; but knew nothing about the merits of the action, and had not formed or expressed any opinion regarding the same, and that he could render a fair and impartial verdict. The juror was a stockholder and treasurer in the Arkansas Valley Smelting Company, and was engaged in smelting ores in Leadville. The plaintiff was also a stockholder in the same company, but it does not appear that the juror was otherwise connected with the plaintiff or with the defendants. Such a showing as this furnished no ground for sustaining the defendants' challenge of this juror for cause. Code Civil Proc. § 163; 2 Grah. & W. New Trials, 253, 254.

It is the legal right of litigants to have their causes tried by the jurors who are first regularly drawn, if, upon being tried, they are found competent, subject to such peremptory challenges as the law allows. It is frequently as injurious to sustain an unfounded challenge as to refuse a well founded one, and sometimes it is even more so; for, if a challenge for cause be refused, while a peremptory challenge remains, relief may be had by a peremptory challenge of the objectionable juror. If, after the trial of a challenge, there is room for reasonable doubt as to the competency of the juror, the ruling of the trial judge should not be disturbed.

The issues in the case, both legal and equitable, having been formed, a jury was called and sworn generally to try the matters at issue between the parties, and a

true verdict render according to the evidence. No objection was interposed to this mode of trial by either party until the defendants offered certain testimony in support of the equitable matters set up in their answer. Plaintiff then objected to the admission of this testimony on the ground that defendants should have first tried their equitable issues; and that, failing to do this, the legal issue only could be submitted to the jury. Such seems to be the practice in California, but certainly there are no such imperative requirements in our code. The code of 1883 provides for equitable matters in both complaint and answer, and specifies what issues shall be tried by the jury and what by the court; but where parties allow, without objection, a jury to be sworn generally to try an action containing issues triable by the court, they should be held to have waived a trial by the court, especially as it is always in the power of the court to order such issues to be tried by a jury. Code, §§ 64, 74, 154. Verdicts in such cases may not have the same binding force as verdicts responsive to strictly legal issues.

There are more important matters, however, than mere questions of practice involved in this case; and in order to a correct understanding of them a further statement of the case becomes necessary. All the original owners of the Matchless lode having made a conveyance thereof to one Foley, by deeds dated during the year 1879, Foley thereafter deeded the same to the plaintiff, and the plaintiff proceeded regularly to obtain a patent therefor from the United States.

The defendants claim that by a certain deed executed by five of the eight original locators there was conveyed to them by metes and bounds an undivided interest in part only of the territory embraced in the Matchless mine, which deed bears date anterior to any of the deeds to Foley, but was not recorded until some time after Foley had purchased and recorded his deeds. The deed under which the defendants claim was on record at the time Foley conveyed to plaintiff as aforesaid.

From the evidence it is difficult to find that there was any consideration for the deed under which defendants claim title, while it is quite clear that the deed was never delivered, nor intended to be delivered. In fact the agreement seems to have been, not that a part of the owners of the Matchless should convey an undivided interest in a portion of their territory to Finnerty and others, but that all of the owners should join in the conveyance of the whole interest in a certain portion of their mining claim; and it further appears that after five had signed the deed a controversy arose as to the boundaries of the territory which the owners of the Matchless were thus to convey, and that in consequence of this controversy the remaining owners refused to sign the deed, and so the agreement was broken off. This partially-executed deed bears upon its face strong corroborating and almost conclusive evidence that it was the intention that all the owners should join therein, as the written description of the premises to be conveyed commences as follows: "All that piece and parcel of land situated," etc. If it had been the intention of the grantors to convey only an undivided interest in the portion of land described, the written description would undoubtedly have so indicated, instead of purporting to convey all. This deed remained in the office of the notary until after his death, when it was obtained, and filed for record, without the knowledge of the grantors. Thus we are relieved from considering the much-controverted question as to whether a deed executed by less than the whole number of the co-tenants, and conveying a portion only of the real estate of the co-tenancy, is void.

When Foley was negotiating to purchase he heard something of this deed, and made certain inquiries about it, but could learn nothing definite, and, finding nothing on record, he purchased. When he sold he said nothing to plaintiff about the deed from the five original locators; and the plaintiff, so far as appears from the evidence, had no notice whatever of the existence of such a deed,

unless the fact that it was recorded when he purchased from Foley was sufficient to charge him with constructive notice. It does not appear that plaintiff, as a matter of fact, knew of such recording when he purchased.

If we concede that the deed under which the defendants claim was executed and delivered for a valid consideration, still Foley, so far as the evidence on the trial shows, may be regarded as an innocent purchaser; for, even if he had sufficient notice of the prior deed to put him upon inquiry, the defendants, who introduced him as a witness to prove this fact, have not shown that he did not make all inquiries that were incumbent upon him under the circumstances. The plaintiff, for the purposes of this review, must be regarded as a *bona fide* purchaser for value. He offered to prove on the trial that he paid $117,000 for the property before he heard of any conflict or claim set up by anybody to any portion of the property in controversy.

If Foley took an indefeasible title against the defendants, then the plaintiff's title becomes doubly secure. But, even if the defendants might have enforced their equities against Foley, still, according to some authorities, plaintiff's title is not necessarily defective. It is held in cases similar to this, where a person takes his conveyance from one holding a first recorded deed, and without actual notice of any fraud on the part of his immediate grantor, that he is not bound, in looking back through the records to the common source of title, to regard anything but the earliest recorded deeds and to deduce his title through such instruments; and that he has the right to presume that the person whose deed was first recorded took a perfect title, and in all respects has the better right, unless he has actual notice to the contrary. We need not, however, base our judgment upon this doctrine. *Ely v. Wilcox*, 20 Wis. 523; *Connecticut v. Bradish*, 14 Mass. 296; *Trull v. Bigelow*, 16 Mass. 418; *Day v. Clark*, 25 Vt. 403.

We come now to consider the effect of plaintiff's patent from the government. The question arising upon this branch of the case may be stated as follows: Conceding that defendants' equities in the property in controversy were such that they might have been enforced against the plaintiff before he obtained his patent, were they forfeited or lost by failing to adverse the application?

Defendants contend that, being co-tenants with the plaintiff of a certain interest in a certain portion of the Matchless lode, therefore whatever plaintiff did to acquire a better title to the property inures to their benefit upon their share being contributed to the expense of procuring the better title. This is familiar doctrine in most cases, but it is subject to exceptions, and in this case cannot be determined without considering the attitude which the parties, plaintiff and defendants, sustained to each other in relation to their claims to the Matchless mine before plaintiff made his application for a patent.

If plaintiff was a tenant in common with defendants of any portion of the mine, he did not become so voluntarily. He bought and took a conveyance of the whole mine from one having a first recorded deed from all the original owners. The evidence fails to show that plaintiff ever in any way recognized defendants, or any of them, or any one under whom they or any of them claim as his co-tenants, or that any work had been done or improvements made upon the property by defendants, or that they had entered into the actual possession thereof, or that they had asserted any claim thereto to the knowledge of the plaintiff before the patent issued. Joint tenants necessarily hold mutual and fiduciary relations to each other in regard to the joint estate which is affected by the four unities — time, title, interest and possession. Tenants by entirety and coparceners are similarly related, but in this case all these unities are wanting, unless it may be the last, and that would seem to have been a possession more constructive than actual. There cer-

tainly was no joint possession, no recognition by the plaintiff of defendants' right or interest in or to the property or any part thereof. Notwithstanding the plaintiff claimed title to the same property from the same source as the defendants, it was by a different instrument. Their claims were always conflicting — always adverse; never friendly — never confidential. The plaintiff, on the face of his deed and by all his actions and conduct, constantly asserted his right to the whole of that which defendants claimed only in part.

It does not appear that plaintiff took any advantage of his supposed relation as a co-tenant to defendants or that he made any use thereof in acquiring his patent. He did not need to do so. His title was complete in itself on the face of the record. He neither did nor said anything to cause defendants to believe that he was acting in their behalf in the least degree in applying for the patent. He entered into no engagements. He had no understanding, expressed or implied, with the defendants in reference to such application. He abused no confidence in taking and retaining the whole title to himself. Under such circumstances, my opinion is that the rule forbidding a co-tenant from acquiring an outstanding title for his own exclusive benefit does not apply. Freem. Co-tenancy, § 155; *Wright v. Sperry*, 21 Wis. 336; *Frentz v. Klotsch*, 28 Wis. 312; *Matthews v. Bliss*, 22 Pick. 52.

Ordinarily there would seem to be no difficulty in determining whether or not persons claiming to be co-owners of mining property located on the public domain should adverse the application for a patent made by one of their own number. If the applicant had previously known or recognized them as co-owners, and especially if there was an understanding with the applicant that he should secure the patent for the benefit of all, a court of equity would undoubtedly protect the interests of the co-owners against an assertion of exclusive ownership by the patentee; but, if these and other like circumstances

calculated to inspire trust and confidence are altogether wanting, I see no reason why those claiming to be co-owners should passively suffer the patent to issue without asserting their rights. *Mining Co. v. Davis*, 11 Colo. 130; *Brittin v. Handy*, 20 Ark. 403.

*Reversed.*